# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  **v.**                     **Case No. 05-CR-22**

**ROBERT J. WACHOWIAK, JR.**
    **Defendant.**

## DECISION AND ORDER

  Defendant Robert Wachowiak, Jr. moves to suppress a statement he made to FBI agents following the execution of a search warrant at his house. He argues that he was in custody at the time of the statement and that agents failed to provide the warnings required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) (holding that suspects must be advised of their rights to silence and counsel before undergoing custodial interrogation). The motion was assigned to a magistrate judge, who held a hearing then recommended denial of the motion. Defendant objects to the recommendation, which I review de novo. 28 U.S.C. § 636(b)(1).

## I. FACTS AND BACKGROUND

  On December 20, 2004, at about 6:30 a.m., agents executed a search warrant at defendant's home seeking evidence of the transmission of child pornography. Approximately ten to fourteen law enforcement officers were involved in the execution, most of whom were wearing "raid jackets" which had "FBI" or some other law enforcement designation stenciled on them. (Tr. at 5-6, 8, 24.) Special Agent Eric Brelsford knocked on the front door and announced the police's presence. (Tr. at 7.) One of the agents

observed an individual, later identified as defendant's father, Robert Wachowiak, Sr., peer out the window then proceed toward a computer with an illuminated screen. This caused the agents to fear destruction of evidence, so they forced entry. (Tr. at 8-9.) Upon entry, agents encountered defendant, clad only in his underwear, at his bedroom door. (Tr. at 10, 55.) Brelsford ordered defendant to raise his hands at gun point, another agent ordered him to the ground at gun point, and he was placed in handcuffs. (Tr. at 10, 28.) Defendant testified that the agents were shouting, that he was scared, and that he almost peed on the floor. (Tr. at 56.) Defendant's father was also handcuffed and detained. (Tr. at 27.)

Defendant was assisted to his feet, taken to the kitchen and placed in a chair until the house was cleared. (Tr. at 30, 57.) About four officers remained with defendant in the kitchen. (Tr. at 31.) While the house was being cleared, defendant was not free to get up and move about. (Tr. at 32, 59.) Defendant appeared distraught and at one point placed his head on the kitchen table. (Tr. at 31-32, 61.) After about five minutes, the cuffs were removed, and defendant was told he was not under arrest. (Tr. at 12.) Brelsford then explained that they were there to execute a search warrant. (Tr. at 58.) Agents retrieved clothes for defendant, as well as his glasses, and he was allowed to dress in the kitchen. (Tr. at 12, 33, 59-60, 62.) He was also offered food and drink. (Tr. at 12.)

Shortly after the cuffs were removed, Brelsford asked defendant if he was willing to come with agents to their offices to discuss the matter, and defendant agreed. (Tr. at 14, 34.) Defendant testified that Brelsford "said I think there's a lot you want to talk about. And we can go talk about it somewhere, and I said yes." (Tr. at 61.) Brelsford testified that he told defendant he was not in custody and it was up to him whether to come. (Tr. at 15, 34-

35.) Defendant testified that he was not told that he had a choice in going, and that he felt he had no choice. (Tr. at 61, 85.)

Brelsford said that defendant was taken to FBI offices for the interview because the home was small and agents were conducting a search. (Tr. at 15.) Defendant was transported in the back of Brelsford's unmarked car, with Agent James Doyle riding in the back with him. Defendant was not cuffed during transport, and the vehicle contained no "cage" or screen. (Tr. at 13-14.) Brelsford did not suggest that defendant take his own car, and defendant was directed where to sit in Brelsford's car. (Tr. at 36, 37, 63.) Brelsford and Doyle asked defendant some general background questions during the trip, which left Brelsford with the impression that defendant was of average or above-average intelligence. (Tr. at 16-17, 64.) During the trip, which lasted about twenty minutes, defendant was told at least once that his cooperation was voluntary and that he did not have to speak if he did not want to. (Tr. at 37.)

Upon arrival at FBI offices, which are located in a general office building, Brelsford parked in a secure area, which required a code to enter, then he, Doyle and defendant went upstairs to one of the FBI's office floors using a secure elevator, which also required a code. (Tr. at 39, 64-65.) A code was also required to enter the office. (Tr. at 40.) Doyle and defendant then went back downstairs to the first floor to get a cup of coffee. (Tr. at 17.) Once they returned, defendant was offered and accepted a Danish. (Tr. at 19.) Defendant was then interviewed by Doyle and Breslford from 7:32 a.m. to 11:15 a.m., during which times he was afforded three bathroom breaks. (Tr. at 20-21, 41; Ex. 1.) One of the agents escorted defendant to the bathroom each time. (Tr. at 42.) He was not, pursuant to FBI policy, allowed to wander freely through the office. (Tr. at 51-52.)

3

Brelsford testified that at the beginning of the interview, defendant was told that it was voluntary for him to be there to answer questions and that he could end the interview any time.[1] However, he was not told that his statements could be used against him. (Tr. at 41, 67.) Defendant made an oral statement, then agreed to provide a written statement.[2] (Tr. at 21-23; Ex. 2.) The first paragraph of the statement, in which defendant wrote that the statement was freely and voluntarily furnished, was boilerplate language suggested by the agents, as was the concluding paragraph stating that defendant was aware he could have left and was not under arrest.[3] (Tr. at 43, 67-68; Ex. 2 at 1, 5.) Nevertheless, defendant testified that he believed he was under arrest. (Tr. at 68.) He based this belief on the fact that he was placed in handcuffs, escorted everywhere, and agents had to use codes to get into the building. (Tr. at 68.) He stated that he did not realize he was going home until the agents said, "we're almost done, and we'll get you home soon." (Tr. at 68.) However, he admitted that he was never told he was under arrest, and that aside from his initial encounter with officers outside his bedroom, agents never raised their voices, and he was never verbally or physically abused. (Tr. at 70-71.) Defendant denied that he had ever been arrested, questioned by police or handcuffed before. (Tr. at 69.)

---

[1] Defendant testified that he did not recall being told this, but did not "doubt that it was." (Tr. at 66.)

[2] Defendant testified that he was not told he did not have to give a written statement. (Tr. at 67.)

[3] Agents also suggested that defendant write several clarifications at the end of the statement. (Tr. at 67; Ex. 2 at 3-4.)

Brelsford stated that defendant was never told he was under arrest, and that defendant never asked to terminate the interview. (Tr. at 23, 81-82.) Breslford admitted that during the interview defendant was at times emotional, but defendant was coherent and able to answer all questions. (Tr. at 45-46.) Brelsford testified that he was friendly and tried to build rapport with defendant to obtain information, but he denied any threats or coercion. (Tr. at 49.) After the interview, defendant was driven back to his residence and dropped off. (Tr. at 20, 81.)

As noted, the magistrate judge concluded that defendant was not in custody while he was being interviewed by the agents. Therefore, he recommended that the motion be denied.

## II. DISCUSSION

### A. Legal Standard

To protect an individual's right against self-incrimination, a suspect must be advised of certain rights prior to being subjected to custodial interrogation. Miranda, 384 U.S. at 444. To implicate Miranda, the suspect must be both "in custody" and subject to "interrogation." United States v. Yusuff, 96 F.3d 982, 987 (7th Cir. 1996). In the present case, it is undisputed that defendant was interrogated by the agents and that he was not first provided with Miranda warnings. The sole question is whether he was in custody at the time of the interrogation.

"An individual is considered 'in custody' when his movement is restrained to the degree comparable to a formal arrest." Id.; see also Oregon v. Mathiason, 429 U.S. 492, 494, 495 (1977). It "'implies a situation in which the suspect knows he is speaking with a

5

government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion.'" United States v. James, 113 F.3d 721, 726 (7th Cir. 1997) (quoting United States v. Martin, 63 F.3d 1422, 1429 (7th Cir. 1995)). The determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Id. "In other words, 'the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation.'" Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). The court considers the totality of the circumstances, including whether: (1) the encounter occurred in a public place; (2) the suspect consented to speak with the officers; (3) the officers informed the individual that he was not under arrest and was free to leave; (4) the suspect was moved to another area; (5) there was a threatening presence of several officers and a display of weapons or physical force; (6) the officers deprived the defendant of documents he needed to continue on his way; and (7) the officers' tone of voice was such that their requests would likely be obeyed. United States v. Wyatt, 179 F.3d 532, 535 (7th Cir. 1999).

**B. Analysis**

In his objections, defendant argues that the magistrate judge erred by concluding that he was not in custody in his house, during the ride to FBI offices, and during the interview.

**1. At the House**

Defendant contends that he was in custody at his house because the police ordered him down at gun point, handcuffed him, and placed him in a kitchen chair surrounded by

6

officers. The Seventh Circuit addressed the issue of detention during a search warrant execution in United States v. Burns, 37 F.3d 276 (7th Cir. 1994). The court held:

> Most detentions that occur during the execution of a search warrant, like most Terry stops, are comparatively nonthreatening. They are often short in duration. Moreover, such detentions are surely less intrusive than the search itself. Furthermore, detention in a person's own residence or hotel room could only add minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station. Therefore, we conclude that, in the usual case, a person detained during the execution of a search warrant is not in custody for purposes of Miranda.

Id. at 281 (internal citations and quote marks omitted).

In Burns, the defendant was detained for less than ten minutes prior to her actual arrest, was not handcuffed or physically restrained during that time, only two law enforcement officers conducted the search, and they did not brandish weapons. Under those circumstances, the court concluded that the defendant was not in custody for purposes of Miranda. Id.

It is true that in the present case the initial encounter between defendant and the agents was more traumatic than in Burns. Defendant, clad only in his underwear, was awoken early in the morning, ordered down at gun point, handcuffed, escorted to the kitchen, and surrounded by officers for about five minutes. Although he was in his own home, he was not allowed to move about or fetch his own clothes or glasses. See Sprosty v. Buchler, 79 F.3d 635, 642 (7th Cir. 1996) (finding that the defendant was in custody when the police surrounded his car, blocked the driveway, and escorted him inside, then four officers searched while another, who was armed and in uniform, guarded the defendant during the three-hour search of the home, during which time officers repeatedly interrogated the defendant and offered him a deal if he would cooperate). However, as the

7

magistrate judge noted, defendant was not interrogated during this time. Thus, although the manner in which defendant first encountered the agents is relevant under the totality of the circumstances, it is not dispositive. See United States v. Jones, 21 F.3d 165, 170 (7th Cir. 1994) ("The confrontational nature of Mr. Jones' initial encounter with the officers does not, by itself, establish custody.").

Additional events occurring prior to the trip to FBI offices served to dissipate the coercive nature of the initial encounter. At the time Brelsford suggested that defendant accompany him downtown defendant was no longer handcuffed. Defendant was also allowed to dress and offered food and drink. He was not allowed to move freely about the house, but this was reasonable given that a warrant was being executed and agents were concerned about the destruction of evidence. See Muehler v. Mena, 125 S. Ct. 1465, 1468 (2005) (finding petitioner's detention in handcuffs during search of premises reasonable); Michigan v. Summers, 452 U.S. 692, 705 (1981) (holding that officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted" in order to prevent flight, minimize the risk of harm to the officers, and facilitate the orderly completion of the search); see also Jones, 21 F.3d at 167 (finding no custody where the defendant was not allowed to return to his van).

Although there is a discrepancy as to precisely what Brelsford said in order to obtain defendant's consent to accompany him, neither version is coercive. Defendant testified that Brelsford "said I think there's a lot you want to talk about. And we can go talk about it somewhere, and I said yes." (Tr. at 61.) Brelsford testified that he told defendant he was not in custody and that it was up to him whether to come (Tr. at 15, 34-35), which defendant denied (Tr. at 61, 85). However, there was no testimony that defendant was told

8

he was under arrest, that he had to come downtown, or that things would be worse for him if he failed to do so.

### 2. On the Ride to FBI Offices

Defendant contends that he was in custody during the trip to FBI offices because he was not allowed to take his own car, he was told where to sit in Brelsford's car, and an agent sat in the back with him. While these circumstances may have created some compulsion, there are other facts that militate against defendant's argument. Defendant was not handcuffed, and the car in which he rode was unmarked and contained no "cage" separating the rear and front seats. Although Agent Doyle sat in the back seat with defendant, there is no evidence that he acted to restrain or intimidate defendant during the trip. Again, the mere fact that defendant rode in a law enforcement vehicle on the brief trip to the FBI offices is not dispositive. See United States v. Scheets, 188 F.3d 829, 842 (7th Cir. 1999) (finding no custody where defendant agreed to be transported in unmarked police car with no cage or screen); Jones, 21 F.3d at 167, 170 (holding that defendant was not in custody when he agreed to be transported to police headquarters in a squad car).

### 3. During the Interview

Finally, defendant argues that he was in custody at the FBI office: agents used a code to enter the parking lot, use the elevator, and enter the office; he was escorted wherever he went within the office; and he had no way to get home other than with the agents. Again, however, other circumstances outweigh the coercive aspects of the encounter. First, defendant was advised at the outset of the interview that the process was voluntary and that he could terminate the interview at any time. He was never told that he

9

Case 2:05-cr-00022-LA    Filed 06/06/05    Page 9 of 12    Document 24

was under arrest, and he never asked to end the interview or speak to a lawyer. Second, the agents were friendly and engaged in no threatening or coercive conduct. Defendant was offered coffee and Danish, and allowed to use the bathroom on request during the interview. Third, at the end of the interview, which lasted only four hours, defendant was driven back home. The fact that defendant was a suspect and the interview may have taken place in a "coercive environment" is insufficient to transform the encounter into custodial interrogation. Mathiason, 429 U.S. at 495 (holding that warnings are not required just because the suspect is questioned at the station house). Defendant's inexperience with the police and his subjective belief that he was in custody are insufficient in light of these facts. United States v. Salyers, 160 F.3d 1152, 1159 (7th Cir. 1998) (declining to consider the defendant's military experience because the "test is not whether the particular defendant thought he was free to go, but whether a 'reasonable person' in the circumstances would have believed so").

This case is quite similar to Jones. In that case, Jones agreed to purchase cocaine from an undercover agent. Following the transaction, a uniformed police officer entered the motel room in which the transaction occurred with his gun drawn, and another officer stopped Jones as he was leaving the room. Approximately five to seven other officers were also present. An officer told Jones that he wanted to speak with him, and Jones said "all right" and "agreed to come." Jones was not allowed to go back to his vehicle at any time outside the motel room. Jones was then driven to police headquarters in a squad car; he was not handcuffed. At police headquarters, officers interrogated Jones in a conference room. He was not given Miranda warnings. 21 F.3d at 167. The court held:

10

> We believe that, when assessed in its totality and giving due regard to the credibility determinations of the district court, the record supports the conclusion that Mr. Jones was not in custody at the time he made the statements in question. The confrontational nature of Mr. Jones' initial encounter with the officers does not, by itself, establish custody. Although Mr. Jones testified that a gun was displayed by an officer, this factor, although important in the overall assessment of the situation, is not outcome determinative. Mr. Jones was not handcuffed or otherwise physically restrained and was told that he was not under arrest. Under these circumstances, we cannot say that Mr. Jones was in custody outside the motel room.
>
> An examination of the entire record, again with due regard for the credibility determinations of the district court, leads to the conclusion that Mr. Jones was not subjected to custodial interrogation after he consented to go to the police headquarters. At the headquarters, Mr. Jones was again informed that he was not under arrest, and that he was free to leave. There is no evidence that the officers made any threatening gestures or statements, or otherwise engaged in "strong arm tactics" justifying a belief by Mr. Jones that he was in custody. . . . On the basis of our study of the record, we must conclude that the district court committed no error in determining that Mr. Jones was not subjected to a custodial interrogation, and therefore his rights under Miranda were not violated.

Id. at 170 (internal citations omitted).

Similarly, in the present case, although defendant initially encountered several armed officers and was detained, after the house was cleared, his handcuffs were removed, and he agreed to accompany agents to FBI Offices in an FBI vehicle. He was not told he was under arrest but rather was advised that answering the agents' questions was voluntary. He was not restrained during the interview, and the agents used no threatening or coercive tactics. Under all of the circumstances, I agree with the magistrate judge that defendant was not in custody.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (Docket # 18) is adopted, and the motion to suppress (Docket # 8) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 6th day of June, 2005.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge